# Spartan Eagle Leasing Capital

A Service-Disabled Veteran Company

## Master Agreement to Lease Equipment

Spartan Eagle Leasing Capital, LLC, Lessor

Home Office: 9314 Forest Hill Blvd, Suite 644, Wellington, Florida 33414
 Phone: (949) 307-3665

And Deeper Dive LA Management, LLC, Lessee

a California LLC, hereby agree as of this: First day of April 2023 , as follows:

1. Agreement to Lease. This Agreement sets forth the basic terms and conditions upon which Lessor shall lease to Lessee and Lessee shall lease from Lessor items of equipment (" Units") specified in this lease, along with the terms and conditions outlined, herein, and attached additional Schedules to be entered into from time to time. Each additional Schedule shall incorporate the terms and conditions of this Agreement and shall constitute a lease as to the additional Units specified in such Schedule. The term "Lease" as to each Unit as used in this Agreement shall mean the current equipment listed herein and any other additional equipment listed in the additioanl applicable Schedules which incorporates the terms and conditions of this Agreement.

2. Acceptance. As of this date, and as per the interim lease of 4/1/2023, Lessee has accepted each Unit for lease delivered or purchased by Lessor to date all of whose detailed description is available upon demand, to include a Falling Film system and associated equipment, a Rolled Film Distillation Short Path Distillation System, two (2) Delta Separations CUP 30 Centrifuge Collection Systems, a Perma Cool Chiller System, and two (2) Perma Cool Condensers and are all currently subject to the Lease. The current total amount of equipment, plus applicable taxes, as of the date of this document is Six hundred and forty-eight thousand, five hundred and sixty six dollars. ($648,566.00) with a monthly lease rate factor of .027483.

3. Rent and Lease Term. Lessee shall pay Lessor Rent for each Unit in the amounts and at the times specified in the Lease. The Lease Term for each Unit shall commence on the 4/1/2023 and shall continue for the period specified in the Lease. (48 months) The Lease Term as to any Unit may not be terminated by Lessee unless otherwise expressly provided in the Lease.

4. Payment Obligation. All Rent and other payments under each Lease shall be made to Lessor at its address shown above, or at such other address as Lessor may designate, or wired to Lessor as mutually agreed, in immediately available funds in such coin or currency of the United States of America which at the time of payment shall be legal tender for the payment of public and private debts. EACH LEASE SHALL BE A NET LEASE, AND LESSEE'S OBLIGATION TO PAY ALL RENT AND OTHER SUMS THEREUNDER SHALL BE ABSOLUTE AND UNCONDITIONAL, AND SHALL NOT BE SUBJECT TO ANY ABATEMENT, REDUCTION, SETOFF, DEFENSE, COUNTERCLAIM, INTERRUPTION, DEFERMENT, OR RECOUPMENT, FOR ANY REASON WHATSOEVER.

5. Statement of Lease. This lease and each additional Lease shall constitute a lease of personal property and Lessee agrees to take all actions necessary or reasonably requested by Lessor to ensure that each Unit shall be and remain personal property, and nothing in any Lease shall be constituted

as conveying to Lessee any interest in any Unit other than its interest as a lessee. Lessee shall, at its expense, protect and defined the interests of Lessor in each Unit against all third party claims; keep each Unit free and clear of any mortgage, security interest, pledge, lien, charge, claim, or other encumbrance (collectively, "Lien"), except any Lien arising solely through acts of Lessor (" Lessor's Lien"); give Lessor immediate notice of the existence of any such Lien; and indemnify and defend Lessor against any claim, liability, loss, damage, or expense arising in connection with any of the foregoing.

6. Use. Each Unit shall be used and operated by Lessee only in the ordinary conduct of its business by qualified employees of Lessee and in accordance with all applicable manufacturer and vendor instructions as well as with all applicable legal and regulatory requirements. Lessee shall not change the location of any Unit from that specified in the Lease without obtaining Lessor's prior consent.

7. Maintenance and Alterations. Lessee shall, at its expense, repair and maintain each Unit so that it will remain in the same condition as when delivered to Lessee, ordinary wear and tear from proper use excepted. Such repair and maintenance shall be performed in compliance with all requirements necessary to enforce all product warranty rights and with all applicable legal and regulatory requirements. Lessee shall enter into and keep in effect during the Lease Term those maintenance agreements with respect to each Unit required by the Lease. Lessee shall, at its expense, make such alterations ("Required Alterations") to each Unit during the Unit's Lease Term as may be required by applicable legal and regulatory requirements. In addition, Lessee may at its expense, without Lessor's consent, so long as no Event of Default, or event which with the passage of time or giving of notice, or both, would constitute an Event of Default ("Incipient Default"), has occurred and is continuing, make alterations (" Permitted Alterations") to any Unit which do not impair the commercial value or originally intended function or use of such Unit and which are readily removable without causing material damage to such Unit. Any Permitted Alterations not removed by Lessee prior to the return of such Unit to Lessor, and all Required Alterations, shall immediately without further action become the property of Lessor and part of such Unit for all purposes of the Lease. Other than as provided in this Section 7, Lessee may make no alterations to any Unit. Any prohibited alterations to a Unit shall, at Lessor's election, immediately become the property of Lessor without further action and without Lessor thereby waiving any Incipient Default or Event of Default.

8. End of Lease Options:
     Return. At the expiration or earlier termination of the Lease Term as to all but not less than all of the Units in this lease or attached addendum, Lessee shall, at its expense, return such Units to Lessor at the location in the continental United States specified by Lessor plus a 5% restocking fee.
     Purchase Right. Lessee shall have the right to purchase all but not less than all of the Units currently included in this lease and the applicable amended Equipment Schedule for a mutually agreed price, typically the Fair Market Value, (FMV).
     Renewal Right. Lessee shall have the right to renew this Lease as to any Unit currently included in this lease and as provided in the applicable amended Equipment Schedule.
     Prepayment of any lease schedule will be subject to all applicable state and US federal tax law requirements and a 5.0% fee will be assessed to the then remaining lease payment balance.

9. Identification. Lessee shall, at its expense, place and maintain permanent markings on each Unit evidencing Ownership, security and other interests therein, as specified from time to time by Lessor. Lessee shall not place or permit to be placed any other markings on any Unit which might indicate any ownership or security interest in such Unit. Any markings, on any Unit not made at Lessor's request shall be removed by Lessee, at its expense, prior to the return of such Unit in accordance with Section 8.

10. Inspection. Upon reasonable prior notice, Lessee shall make each Unit and all related records available to Lessor or its agents for inspection during regular business hours, at the location of such

Unit.

11. No Lessee Sublease or Assignment. Lessee shall not, unless, expressly permitted in the Lease, sublease or otherwise, relinquish possession or control of, or assign, pledge, hypothecate, or otherwise transfer, dispose of, or encumber, any Unit, this Agreement or any Lease or any part thereof or interest therein, or any right or obligation with respect thereto without prior written consent from Lessor.

12. Lessor Assignment. Lessor may from time to time without notice to Lessee sell, grant a security interest in, assign, or otherwise transfer (collectively "Transfer"), in whole or in part, this Agreement, one or more Leases, any or all Units, or any of its interests, rights, or obligations with respect thereto, including without limitation all Rent and other sums due or to become due under any Lease, to one or more persons or entities (" Assignee"). Each Assignee shall have, to the extent provided in any Transfer document, Lessor's rights, powers, privileges, and remedies with respect thereto, but shall not be obligated to Lessee, except to the extent expressly provided in any Transfer document, to observe or perform any duty, covenant, or condition required to be observed or performed by Lessor. Except to the extent expressly assumed by an Assignee in any Transfer document, no Transfer shall relieve Lessor from any of its obligations to Lessee. Lessee shall, upon receipt of notice of a Transfer from Lessor, be bound by such Transfer. Lessee shall not assert against any Assignee any claim, defense, counterclaim, or setoff that Lessee may at any time have against Lessor.

13. Liens. Lessee shall not directly or indirectly create, incur, assume, or suffer to exist any Lien on or with respect to any Unit or Lease, Lessor's title to any such Unit, or other interest or right of Lessor with respect thereto, except Lessor's, Liens. Lessee, at its expense, shall promptly pay, satisfy, and take such other action as may be necessary or reasonably requested by Lessor to keep each Unit and Lease free and clear of, and to duly and promptly discharge, any such Lien.

14. Risk of Loss, Lessee shall bear all risk of loss, damage, theft, taking, destruction, confiscation, or requisition with respect to each Unit, however caused or occasioned, which shall occur prior to the return of such Unit in accordance with Section 8. In addition, Lessee hereby assumes all other risks and liabilities, including without limitation, personal injury or death and property damage, arising with respect to each Unit (unless arising solely through Lessor's willful misconduct), including without limitation those arising with respect to the manufacture, purchase, ownership, shipment, transportation, delivery, installation, leasing, possession, use, storage, and return of such Unit, howsoever arising, in connection with any event occurring prior to such Unit's return in accordance with Section 8.

15. Casualty. If any Unit shall become lost, stolen, destroyed, or irreparably damaged from any cause whatsoever, or shall be taken, confiscated, or requisitioned (any such event herein called an "Event of Loss"), Lessee shall promptly notify Lessor of the occurrence of such Event of Loss, and shall pay Lessor, within 15 days after the date of such Event of Loss (but in no event later than the Rent payment date next following such Event of Loss), an amount equal to the applicable Casualty Value of such Unit as calculated at the time of loss. Upon Lessor's receipt of such payment in full, the Lease shall automatically terminate as to such Unit, and Lessor's right, title, and interest in such Unit shall immediately without further action pass to Lessee, on an as-is, where-is basis, without recourse or warranty.

16. Insurance. Lessee shall, at its expense, cause to be carried and maintained for each Unit, commencing at the time any risk shall pass to Lessor as to such Unit and continuing until the return of such Unit in accordance with Section 8, insurance against such risks, in such amounts, in such form, and with such insurers, all as may be satisfactory to Lessor. If any insurance proceeds are received with respect to an occurrence which does not constitute an Event of Loss, and no Incipient Default or Event of Default has occurred and is continuing, such proceeds shall be applied to payment for repairs. If any insurance proceeds are received by Lessor with respect to an occurrence which constitutes an Event of Loss, and no Incipient Default or Event of Default has occurred and is

continuing, such proceeds shall be applied toward Lessee's obligation to pay the applicable Casualty Value for such Unit. If an Incipient Default or Event of Default has occurred and is continuing, any insurance proceeds received shall be applied as Lessor in its sole discretion may determine. At the time each Schedule is executed and thereafter on a date not less than 30 days prior to each insurance policy expiration date, Lessee shall deliver to Lessor certificates of insurance or other evidence satisfactory to Lessor showing that such insurance coverage is and will remain in effect in accordance with Lessee's obligations under this Section 16. Lessor shall be under no duty to ascertain the existence of any insurance coverage or to examine any certificate of insurance or other evidence of insurance coverage or to advise Lessee in the event the insurance coverage does not comply with the requirements hereof. Lessee shall give Lessor prompt notice of any damage, loss, or other occurrence required to be insured against with respect to any Unit.

17. Taxes and Fees. Lessee hereby assumes liability for, and shall pay when due, and on a net after-tax basis shall indemnify and defend Lessor against, all fees, taxes, and governmental charges (including without limitation interest and penalties) of any nature imposed upon or in any way relating to Lessor, Lessee, any Unit (including without limitation the manufacture, purchase, ownership, shipment, transportation, delivery, installation. leasing, possession, use, operation, storage, and return of such Unit) or any Lease, except state and local taxes on or measured by Lessor's net income payable to each state and locality in which Lessor maintains one or more places of business immediately prior to the date of the applicable Lease (other than any such tax which is in substitution for or relieves Lessee from the payment of taxes it would otherwise be obligated to pay or reimburse Lessor as provided), and federal taxes on Lessor's net income. Lessee shall at its expense file when due with the appropriate authorities any and all tax and similar returns and reports required to be filed with respect thereto (with copies to Lessor) or, if requested by Lessor, notify Lessor of all such requirements and furnish Lessor with all information required for Lessor to effect such filings, which filings shall also be at Lessee's expense.

18. Indemnification. Lessee hereby assumes liability for, and shall pay when due, and shall indemnity and defend Lessor against, any and all liabilities, losses, damages, claims, and expenses in any way relating to or arising out of any Lease or any Unit, including without limitation the manufacture, purchase, ownership, shipment, transportation, delivery, installation, leasing, possession, use, operation, storage, and return of such Unit. Lessee shall give Lessor prompt notice of any occurrence, event, or condition in connection with which Lessor may be entitled to indemnification hereunder. The provisions of this Section 18 are in addition to, and not in limitation of, the provisions of Section 17.

19. Limited Warranty. Lessor warrants to Lessee that, so long as no Incipient Default or Event of Default has occurred and is continuing, Lessor will not interfere with Lessee's use and possession of the Units. LESSOR, NOT BEING THE MANUFACTURER OR  VENDOR OF THE UNITS NOR A DEALER IN SIMILAR EQUIPMENT, MAKES NO OTHER REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER, INCLUDING WITHOUT LIMITATION THE DESIGN OR CONDITION OF THE UNITS, THEIR MERCHANTABILITY, DURABILITY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, INFRINGEMENT, THE QUALITY OF THE MATERIAL OR WORKMANSHIP OF THE UNITS, OR THE CONFORMITY OF THE UNITS TO THE PROVISIONS OR SPECIFICATIONS OF ANY PURCHASE ORDER RELATING THERETO, AND LESSOR HEREBY SPECIFICALLY DISCLAIMS ANY AND ALL SUCH REPRESENTATIONS AND WARRANTIES. LESSEE ACKNOWLEDGES THAT IT HAS MADE THE SELECTION OF EACH UNIT BASED UPON ITS OWN JUDGMENT AND EXPRESSLY DISCLAIMS ANY RELIANCE ON STATEMENTS MADE BY LESSOR AND AGREES THAT LESSOR SHALL NOT BE LIABLE FOR ANY CONSEQUENTIAL DAMAGES ARISING OUT OF THE USE OF OR INABILITY TO USE THE UNITS. LESSEE AGREES THAT THE UNITS ARE LEASED "AS IS." Lessor hereby appoints Lessee as Lessor's agent, so long as no Incipient Default or Event of Default has occurred and is continuing, to assert  at Lessee's expense any right Lessor may have against any manufacturer or vendor to enforce any product warranties with respect to each Unit during such Unit's Lease Term; provided, however, Lessee shall indemnify and defend Lessor against all claims, expenses, damages, losses and liabilities incurred or suffered by Lessor in connection with any such action taken by Lessee.

20. Events of Default. An "Event of Default" shall occur if (a) Lessee fails to make any Rent or other payment under any Lease when due and such failure continues for a period of 5 days thereafter; (b) Lessee violates any covenant set forth in Section 8, 11, or 16 or the last sentence of this Section 20; (c) Lessee violates any other provision of this Agreement, any Lease or any document furnished Lessor in connection herewith or therewith and such violation shall continue unremedied for a period of 20 days after notice from Lessor; (d) Lessee or any guarantor of Lessee's obligations under any Lease (" Guarantor") or any material subsidiary of Lessee or Guarantor (" Subsidiary") shall be in default with respect to any other agreement with Lessor or any other obligation for the payment of borrowed money or rent; (e) Lessee, any Guarantor or any Subsidiary shall commit an act of bankruptcy or become or be adjudicated insolvent or bankrupt or make an assignment for the benefit of creditors or become unable or admit in writing its inability to pay its debts as they become due, or a trustee receiver or liquidator shall be appointed for Lessee, any Guarantor or any Subsidiary, or for a substantial part of its property, with or without its consent, or bankruptcy, arrangement, reorganization, composition, readjustment, liquidation, insolvency, dissolution, or similar proceedings under any present or future statute, law, or regulation shall be instituted by or against Lessee, any Guarantor, or any Subsidiary, or Lessee, any Guarantor, or any Subsidiary shall file an answer admitting the material allegations of a petition filed against it in any such proceeding, or any execution or writ or process shall be issued under any proceeding whereby any Unit may be taken or restrained, or Lessee, any Guarantor, or any Subsidiary shall cease doing business as a going concern; or Lessee, any Guarantor, or any Subsidiary shall, without Lessor's prior consent, sell, transfer, pledge, or otherwise dispose of all or any substantial part of its assets, or consolidate or merge with any other entity; or (f) any representation or warranty made by Lessee, any Guarantor, or any Subsidiary in any document furnished Lessor under or pursuant to this Agreement or any Lease shall be incorrect or incomplete at any time in any material respect. Lessee shall promptly notify Lessor of the occurrence of any Incipient Default or Event of Default.

21. Remedies. If one or more Events of Default shall have occurred and be continuing, Lessor, at its option, may (a) proceed by appropriate court action or actions, either at law or in equity, to enforce performance by Lessee of the applicable covenants of each Lease or to recover damages for the breach thereof, including without limitation net after-tax losses of federal, state, and local income tax benefits to which Lessor would otherwise be entitled as a result of owning any Unit or leasing such Unit to Lessee, or (b) by notice to Lessee terminate any or all Leases with respect to any one or more of the Units covered thereby, whereupon all rights of Lessee to the possession and use of such Units shall absolutely cease and terminate as though each such Lease as to such Units had never been entered into; provided, however, Lessee shall nevertheless remain liable under each such Lease; and thereupon Lessor may, by its agent or agents, enter upon the premises of Lessee or any other premises where any of such Units maybe located and take possession of all or any of such Units and from that point hold, possess, operate, sell, lease, and enjoy such Units free from any right of Lessee, its successors and assigns, to use such Units for any purposes whatsoever without any duty to account to Lessee for any action or inaction or for any proceeds arising therefrom; provided, however, Lessor shall nevertheless have a right to recover from Lessee any and all amounts which under the terms of each such Lease may be then due or which may have accrued to the date of such termination and also to recover immediately from Lessee a "To be Determined" amount of the following as damages for loss of the bargain and not as a penalty, whichever of the following sums, with respect to each such Unit, Lessor in its sole discretion shall specify by notice to Lessee: (i) an amount equal to the excess, if any, of the Casualty Value for such Unit, in effect for the Rent payment period during which the specified Event of Default occurred, over the present value (computed as of the Rent payment date next following the date of such notice) of the rent which Lessor reasonably estimates will be realized for such Unit for the remainder of the initially specified Lease Term of such Unit following the termination of the Lease, such present value to be computed by discounting such estimated rent payments at a 9% per annum rate of interest (based on a 360-day year and 30-day month), plus a 5% restocking fee, or (ii) an amount equal to the excess, if any, of the Casualty Value for such Unit in effect for the Rent payment period during which the specified Event of Default has occurred over the amount Lessor reasonably estimates to be the sales value of such Unit as of the date of the estimate specified in such notice and  all damages, losses, liabilities, claims,

and expenses (including without limitation expenses incurred in connection with the recovery, repair, repainting, return, and remarking of any Unit or other exercise of Lessor's remedies hereunder and reasonable attorneys' fees) which Lessor shall sustain in connection with any Event of Default at Lessors discretion. No remedy referred to in this Section 21 shall be deemed exclusive, but all such remedies shall be cumulative and shall be in addition to all other remedies in Lessor's favor existing under this Agreement, any Lease or otherwise at law or in equity.

22. Financial Information. Lessee agrees to furnish Lessor (a) as soon as available, and in any event within 120 days after the last day of' each fiscal year of Lessee, a copy of the financial statements of Lessee as of the end of such fiscal year, certified by an independent certified public accounting firm of recognized standing reasonably satisfactory to Lessor, (b) within 45 days after the last day of each fiscal quarter of Lessee a copy of its financial statements as of the end of such quarter certified by the principal financial officer of Lessee, and (c) such additional information concerning Lessee, any Guarantor, and any Subsidiary as Lessor may reasonably request.

23. Lessor's Qualified Obligation. Lessor shall not be obligated to lease any Unit specified in a Lease to Lessee if (i) such Unit is not accepted by Lessee on or before the Acquisition Expiration Date specified in such Lease or (ii) the Acquisition Cost of such Unit, when added to the Acquisition Cost of the Units specified in such Lease previously accepted for lease, is in excess of the Aggregate Acquisition Cost set forth in such Lease. In addition, anything in this Agreement or any Lease to the contrary notwithstanding, Lessor shall not be obligated to acquire or lease to Lessee any Units not already subject to a Lease if Lessor determines Lessee's financial or business condition (or that of any Guarantor or any Subsidiary) has suffered any material adverse change from the condition existing or represented to Lessor as at the date of such Lease. In such event, Lessee shall promptly pay Lessor and indemnify and defend Lessor against all amounts which Lessor has expended or may be or become obligated to expend with respect to each such Unit and the transactions contemplated under the Lease and shall assume, undertake, and relieve Lessor of, and indemnify and defend Lessor against, all damages, losses, claims, liabilities, obligations, and duties under any related requisition, purchase order, purchase contract, or otherwise with respect thereto.

24.   Late Charges; Security Deposit; Advance Rentals. Any nonpayment of Rent or other amounts payable under any Lease shall result in Lessee's obligation to promptly pay Lessor as additional Rent on such overdue payment, for the period of time during which it is overdue (without regard to any grace period), interest at a rate equal to the lesser of (a) the Late Charge set forth in the Lease of 5%, or (b) the maximum rate of interest permitted by law.  Lessor may apply any security deposit required under any Lease toward any obligation of Lessee thereunder; shall return any unspoiled balance to Lessee, without interest, unless otherwise required by applicable law, upon satisfaction of Lessee's obligations thereunder; and may, unless otherwise required by applicable law, commingle such security deposit with its other funds.  In the event that Lessor applies a security deposit to satisfy an obligation of Lessee under any Lease, Lessee shall immediately replace any portion of the security deposit so applied by Lessor.  Lessee shall pay any advance rental payments provided for in any Lease at the time Lessee executes such Lease.  All such advance rental payments shall (i) be deemed earned by Lessor immediately upon their receipt by Lessor, (ii) be applied immediately in satisfaction of Lessee's advance rental payment obligations under such Lease, and (iii) not be refundable to Lessee for any reason, including in connection with any premature termination of such Lease.

25. Lessor's Right to Perform for Lessee. If Lessee fails to duly and promptly pay, perform, or comply with any of its obligations, covenants, or agreements under any Lease, Lessor may itself pay, perform, or comply with any of such obligations, covenants, or agreements for the account of Lessee without thereby waiving any Incipient Default or Event of Default. In such event, any amount paid or expense incurred by Lessor in connection therewith shall immediately on demand, together with interest as provided in Section 24, be paid to Lessor as additional Rent, and Lessee shall indemnify and defend Lessor against any damage, loss, claim, liability, or expense suffered or incurred by Lessor in connection therewith.

26. Notices. Any consent, instruction, or notice required or permitted to be given under any Lease shall be in writing and shall become effective when delivered, or if mailed when deposited in the United States mail with proper postage prepaid for registered or certified mail, return receipt requested, addressed to Lessor or Lessee, as the case may be, at their respective addresses set forth herein or at such other address as Lessor or Lessee shall from time to time designate to the other party by notice similarly given.

27. Miscellaneous.  Lessee and Lessor acknowledge and agree that each applicable Schedule is a "finance lease" for purposes of Uniform Commercial Code Article 2A, and that Lessee's and Lessor's rights and obligations are to be interpreted accordingly and, to the extent permitted by Law, Lessee hereby waives all rights that may be conferred on it by Uniform Commercial Code§ 2A-508 through § 2A-522; *provided,* that (subject to the other provisions of this Agreement) Lessee shall in any event have the right to pursue a court proceeding for actual direct damages caused by Lessor's breach of its obligations hereunder. Lessee shall, at its expense and upon Lessor's demand, promptly execute, acknowledge, deliver, file, register, and record any and all further documents and take any and all other action reasonably requested by Lessor from time to time, for the purpose of fully effectuating the intent and purposes of each Lease, and to protect the interests of Lessor, its successors and assigns. Any provision of any Lease which is prohibited or not fully enforceable in any jurisdiction shall, as to such jurisdiction, be ineffective only to the extent of such prohibition or unenforceability without otherwise invalidating or diminishing Lessor's rights thereunder or under the remaining provisions thereof in such jurisdiction, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by applicable law, Lessee hereby waives its rights under any provision of law now or hereafter in effect which might limit or modify or otherwise render unenforceable in any respect any remedy or other provision of any Lease. No term or provision of any Lease may be amended, altered, waived, discharged, or terminated except by an instrument in writing signed by a duly authorized officer of the party against which the enforcement of the amendment, alteration, waiver, discharge, or termination is sought. No delay by Lessor in exercising any right, power, or remedy under any Lease shall constitute a waiver, and any waiver by Lessor on any one occasion or for any one purpose shall not be construed as a waiver on any future occasion or for any other purpose. Except as otherwise specifically provided in any Lease, each Lease shall be governed in all respects by, and construed in accordance with, the laws of the State of Florida, without regard to its choice of laws principals. All of the covenants and agreements of Lessee contained in each Lease shall survive the expiration or earlier termination of such Lease and the Lease Term of the Units leased thereunder. Subject to all of the terms and provisions of each Lease, all of the covenants, conditions, and obligations contained in such Lease shall be binding upon and inure to the benefit of the respective successors and assigns of Lessor and Lessee. Each Lease, and any documents executed and delivered in connection therewith, shall constitute the entire agreement of Lessor and Lessee with respect to the Units leased thereby, and shall automatically cancel and supersede any and all prior oral or written understandings with respect thereto. This Agreement and each Lease may be executed in any number of counterparts, each of which, when so executed and delivered, shall be an original (except that to the extent, if any, this Agreement or any Lease constitutes chattel paper, no security interest therein may be created except through the transfer or possession of the original counterpart, which shall be identified by Lessor), but all such counterparts taken together shall constitute one and the same instrument. The headings in this Agreement and each Lease shall be for convenience of reference only and shall form no part of this Agreement or such Lease.

28. Merger or Consolidation. Notwithstanding anything herein to the contrary, Lessee may assign or transfer this Lease and its leasehold interest in the Units to any corporation  incorporated under the laws of any state of the United States of America into or with which Lessee shall have merged or consolidated or which shall have acquired all or substantially all of the property of Lessee, provided that such assignee or transferee will not, upon the effectiveness of such merger, consolidation, or

acquisition and the assignment or transfer of this Lease to it, be in default under any provision of this Lease.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their authorized representatives as of the date first above written.

Spartan Eagle Leasing Capital, LLC, Lessor

By: James Lake _____*james lake*_____
Title: Manager

 Deeper Dive LA Management, LLC , Lessee

By: Matthew Novello, Esq. ___Matthew Novello_____
Title: Partner, Co-Founder, Officer, General Counsel
Address: 2936 E. 11th Street, Los Angeles, California 90023
Phone: (248) 885-0011

**Signature:**

**Email:**  mnovello@novellolawfirm.com

# DDLA Master Agreement to Lease Equipment v2

Final Audit Report                                            2023-09-25

| | |
|---|---|
| Created: | 2023-09-14 |
| By: | james lake (jim@spartan-eagle.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAANaZZartdanK7eCRXd-7AUwvZgAfnYdUF |

## "DDLA Master Agreement to Lease Equipment v2" History

📄 Document created by james lake (jim@spartan-eagle.com)
2023-09-14 - 3:50:39 PM GMT- IP address: 174.176.96.165

📧 Document emailed to Matt Novello (mnovello@novellolawfirm.com) for signature
2023-09-14 - 3:51:14 PM GMT

📄 Email viewed by Matt Novello (mnovello@novellolawfirm.com)
2023-09-15 - 4:52:33 PM GMT- IP address: 98.209.155.190

📄 Email viewed by Matt Novello (mnovello@novellolawfirm.com)
2023-09-25 - 7:08:59 PM GMT- IP address: 75.213.132.157

✒ Document e-signed by Matt Novello (mnovello@novellolawfirm.com)
Signature Date: 2023-09-25 - 7:09:37 PM GMT - Time Source: server- IP address: 75.213.132.157

✅ Agreement completed.
2023-09-25 - 7:09:37 PM GMT

![Adobe Acrobat Sign]